Good morning, Counsel. Good morning, Your Honors. Good morning. May it please the Court, I'm Paul Gerding. I'm here as a counsel for Evernal Insurance Company with Ms. Echo Reynolds from QTAC RAC. Can you keep your voice up, Counselors? Your voice is dropping a little. Apparently. Is that better here? Yes. Thank you. I'll reserve a few minutes, if possible, for rebuttal. All right. Thank you, Your Honors, for your indulgence. After a fascinating morning, we get to end the morning with what the Supreme Court of the State of South Carolina called the catacombs of other insurance policy, English. In that regard, we believe the central issue... But we are under what law applies here? Federal. Thank you. And the State of Arizona. We're under Arizona law. Thank you. But after reading all those cases, that one clause did jump out at me. Yeah. So, Your Honor, the central issue here is the Court's decision, the District Court, with regards to his belief that the CIG policy was written to apply in excess of other policies that covered the same acts or errors or omissions. The CIG policy was plainly written to be a primary policy. It said so on its Certificate of Insurance, and it stated within its own terms that the coverage afforded herein is primary. The CIG policy was written as a primary policy without regard to which employees may or may not obtain separate E&O policies on their own, and regardless of whether some, none, or all of the many hospitals and clinics the master policy served, the CIG policy was, on its face, written to cover additional insurance with primary coverage. Well, but what about the clause which says that if any employee has another policy or policies covering a loss, it shall be excess? Well, the Emerald Policy had, as you're aware, Your Honor, the same language, and many policies have this other insurance language, and that's why, although this was so back for decades, where the courts have wrestled with this type of language, have wrestled with whether we look at intent, whether we look at totality of circumstances, or, as in Arizona, do we assume some mutual repugnancy if, on their face, the two policies appear to be covering the same loss and nearly identical? If this captive carrier, CIG, wanted the coverage it afforded to its additional insurers to be excess, then it simply should have said, as many of the cases have pointed out, that it had a limit that it would be in excess to, or it would specifically apply to a separate policy. It would say, for example, this policy is in excess to the Emerald Policy, or this policy is excess to a variety of other policies. These types of things occur frequently, as this Court knows, as stated in its AHMS case, in the Ninth Circuit, that sometimes these policies are stacked one upon the other, and whether one is primary excess sometimes does take an analysis of how are they written. But, for example, in that case, which this Court decided, it was fairly easy to determine, looking at each of the policies on a case-by-case basis, which policy was excess to the next. This type of stacking of policies is not uncommon. And having multiple policies covering the same insured for the same acts is also not uncommon. Hence, that is why we have all of these other insurance policy decisions, because this happens all the time. And it can happen, as the case law points out, with not just two policies in contradiction with one another. Sometimes there are many policies in contradiction with one another. So, again, Your Honor, we believe that the Court essentially treated this policy without any support and without any language within its title or within its declarations or certificate, like an umbrella policy. That this master policy somehow just covered everybody else, and that somehow they would all get other insurance. But there's no evidence in the record that Dr. Schwartz or the other physicians, for that matter, were to get their own policy. They were covered by the CIG policy. You say there's nothing in the record that indicates they are to get their own policies? There is a, with regards to all the other physicians, we know there is a physician's policy. We don't know whether that physician's policy covers Dr. Schwartz, because we were never allowed to see it. Right, but does it matter at all that Dr. Schwartz obtained insurance from Admiral in addition to any insurance that would have been part of his employment package? Does that matter at all? Absolutely not, because he was allowed to get that policy. It is not uncommon for hospitals, clinics, and physicians to have redundant policies as they did in this case. And again, the master policy was drafted without regard to the Admiral policy. It was drafted well before it. They never knew that there was going to be a Dr. Schwartz when they drafted that policy. They never knew that there was going to be this type of... Who paid the premium for Dr. Schwartz's policy? Well, that's an interesting question, Your Honor. We honestly don't know. And as we pointed out in our brief, there is a statement by CIG that if they paid it, it would have been paid by the clinic or it would have been paid by the community parent company. But we never actually got a statement within the record that it was in fact paid by CIG. And again, Your Honor, even if that was true, even if it did happen, the policy on its face covered Dr. Schwartz as a primary policy. That's what we're here to decide. Well, I'm certainly taking my position. The policies, other insurance clauses, as the case law in Fremont and other cases have shown, when you have two nearly identical policies like this, when you have two policies that are drafted covering the same insured risk and frankly the same insured, rather than find ourselves in the battle of which policy can be more specific, as pointed out in the hardware case, or which policy can outright the other policy, which insurer can outright the other policy, something that's been going on since 1968 according to the hardware case. The Arizona Supreme Court and the trend pursuant to the Dart case is, let's find these to be mutually repugnant. Let's protect the interests of the insured first. Let's go forward and find that when insurance companies are looking for these excess clauses, which are, in fact, in many ways, escape clauses, let's be absolutely certain that we protect who we're supposed to protect. Let's bind the carriers to that contract, which they agreed to for good and valuable consideration, and on a pro rata basis, split the damages. Admiral, in this case, stepped up from the very beginning. They covered their insured in the underlying case. They were not aware that there was a second policy until they discovered when the clinic was drafted into the case that there were. Because your policy insured the doctor, right? Yes, ma'am. We did insure the doctor, and at that point, we stepped up immediately and covered him. We believe the CIG policy, as it states on its face, also covered the doctor. CID did not get involved until such time as the clinic was involved. At that point, there was some interest in whether or not the CIG policy covered the physician as well. Requests were made. There were questions with regards to it. Now, CIG makes much of the fact that because we were asking, we must have known that Dr. Schwartz was covered by this policy, but that's not the case at all. All we knew was that there was a certificate of insurance that demonstrated that he wasn't insured. Counsel, may I ask you about the insurance provision in the employment agreement? Yes, ma'am. Section 9.1. It appears to say that the employer should either procure malpractice liability insurance or assume responsibility for a physician's existing malpractice liability insurance premiums. Why doesn't that point us to the fact that the insurance policy that was procured by the physician was meeting the second prong and therefore primary? Well, we don't really know what they're talking about there. Are they talking about the master policy or are they talking about the physician's policy? And again, let's go back to the insurance policy itself, what the insured was entitled to. Dr. Schwartz had an insurance policy that said he was protected with primary coverage for the errors and omissions that were ultimately at issue in this case. So regardless of whether there was a separate employment agreement that referenced that he may have one or the other, we don't know whether that was going to be the master policy or, as we've heard from CIG, there was this frankly phantom other physician's policy, which we've been told. But does it matter if, I mean, if the agreement with the employer was that the employer would either maintain the insurance or assume his insurance, why isn't the clear import of that language that if he has separate insurance, that's his insurance as opposed to insurance provided by the employer? That seems to me to be a fair reading of this. I guess the question is, are you getting then to the intent of the policy or are you getting to the intent of the employment agreement? We're saying that the intent of the policy is on its face. It says that it is a primary policy. And if we're going to go to some type of totality of circumstances test, then let's look at all of the totality of circumstances. Let's go back and let's find out, was there a physician's policy? Was Dr. Schwartz covered by that policy? Let's find out what actually happened. We can't assume, and this was the inference that we objected to with regards to Judge Campbell's decision, we can't just assume that because the community clinic paid for a very expensive policy, we're going to assume, for all of its clinics, that it wouldn't want to pay for separate physician's policies. In order to actually rule, the court should have made justifiable inferences in support of the non-movement admiral. It should have looked at it and said, perhaps that policy, when we look at the premiums, demonstrates that, in fact, it was a very expensive primary policy, but we never got to see it. And, in fact, what we were told by CIG was essentially a too-big-to-fail argument that it's so large you're not going to be able to construe it. But this court looks at premiums. This court looked in the AHMS case at premiums and said that that is relevant to determine the actual intent of the underlying policy at issue. Your Honor? So if the court were to agree that there should be an analysis that goes beyond the policy language itself, then we're saying, make justifiable inferences and give us the opportunity to go back and see what went into that policy, what was the intent with regards to the policy paid for the clinic. Let's see what the premiums were. That's a fairly simple analysis. Yes, Your Honor? But the district court was looking at the language and said it was excess, right? With regards to which, Your Honor? With regard to the clinic policy. The district court found the policy and said it was excess. Yeah. I think that's wrong. This is a very confusing area of the law. And I believe that Judge Campbell is a fine judge and was doing his best... He's not a confused man, normally. No, he's not. For the record, he's a very sharp man. But in this case, he was trapped by the idea that the policy was because of the exclusion within the Admiral policy, which excluded those policies that were written to apply in excess. He believed that the CIG's other insurance language made it written to apply in excess. And the courts get to what are pure excess policies, what are true excess policies, those policies that state that threshold, that name the other policy, that call themselves excess. And the courts have also said other insurance clauses on their own do not create an excess policy. They may make it excess for purposes of the analysis, but it doesn't make it actually written to be excess. All right, Counselor, do you want to say something? Go ahead, Judge Toretto. I just wanted to ask the following. Assuming we agree with you on this first point, do we... Can we go into this elective tender rule issue notwithstanding the fact that the district court didn't rule upon it? We believe that Your Honor can rule on this de novo. So, in all fairness, I believe the court can look at those issues. The district court did not go into this analysis, but in that regard, Your Honor, and we'll address the selective tender issue briefly. Selective tender implies on its face that the party had something to select. In this case, there was nothing for Dr. Schwartz or Admiral to select because, frankly, CIG laid in the reeds and hid the information from us to the very end. CIG makes a lot about, well, when you filed a lawsuit against us, didn't you know or reasonably know that you had the insurance policy? Well, excuse me, but I understand the selective tender rule means that at the time the claim is made, the insurer who is asking for contribution notifies the other insurers so that they can also participate in the defense. Are you talking about the first case or the second case, Your Honor? There was a second case that was involved where defense was tendered later in the game. However, that case, we believe, is distinguishable. In that case, the clinic, we believe, was not a defendant. The admiral did not have the opportunity to work with the clinic. Therefore, tender was made. We're saying that constructively, tender was made in the first case, and they were actually aware and knew of the demand for coverage. The Quanta case was cited by CIG. Judge Teelberg said that there's no application of selective tender that he could find in Arizona. But he further stated, he remanded the case back to say, let's find out whether there was notice given and not only just notice under Arizona law, notice that we want a participation in this case. That was given. When you look at the e-mails from Mr. Mansfield to the opposing counsel, he said that he didn't know whether or not there was coverage. But it was clear that this could be a problem in the settlement discussions that were going on in 2012. That was followed up by correspondence at CIG, at their counsel's level, that they knew the admiral was looking to draw them into the settlement discussions and assume some liability for those discussions. So, CIG had notice, and they knew exactly what we wanted, but they hid the policy. In any event, there is enough in the record. So, if this case were going to be decided in the alternative, it could be. With regards to selective tender? Yes. We believe it may be, as the case is de novo. All right, counsel, you've exceeded your time. Do you have anything else, Judge Rhea? No, thank you very much. All right. Thank you. Thank you, counsel. We'll hear from CIG. Well, I have the pleasure of being the first person today to be able to say good afternoon, Your Honors. May it please the Court. Rapali Desai on behalf of CIG Community Insurance Group. I hope to not take up all my time today because I actually believe this case is very straightforward and may be affirmed based on the plain language of the insurance policies, which is exactly what Judge Campbell, in this case, held his ruling based on. In his order granting summary judgment to CIG, Judge Campbell explained how courts in Arizona interpret insurance policies. He explained the provisions in the insurance contract are interpreted according to the plain and ordinary meaning. The court's analysis should start with the plain and ordinary meaning of insurance contracts, and we submit that in this case, this court's analysis should also end there. The language of the CIG insurance policy is clear. The policy provides only excess coverage to Dr. Schwartz in this case because he had a primary insurance policy through Admiral. That is not a fact that is in dispute. Admiral admits that it provided a primary insurance policy to the physician. In fact, Judge Rawlinson, you pointed to the employment agreement that's precisely the document that establishes that a physician that is employed with the clinic should either have his own primary insurance policy that the clinic pays for, or he can opt to have the hospital or the clinic purchase a primary insurance policy for him. Counsel said that we don't know if there was a separate physician policy purchased through the clinic for Dr. Schwartz. That's simply untrue. The fact that Admiral does not believe or agree with the evidence that was produced in the court, that there was no physician policy purchased by the clinic, does not mean that the fact is somehow unclear or it's not established in the record. It's clearly established in the record, and Judge Campbell held as much. But what exactly was clearly established? What was clearly established is that there was one physician primary policy that was issued to Dr. Schwartz, and that policy was issued by Admiral. And the premiums for that policy were paid for by CHS, the holding company of the clinic. Why is it the practice of the hospital not to provide the insurance contract or the provisions of the insurance policy? What's that all about? So the hospital systems, to step back for a moment, these hospital systems are huge. They have hundreds and hundreds of hospitals and clinics with thousands of employed physicians. So in recent years, a lot of these hospital systems kind of developed their own captive insurance companies. SIG is a captive insurance company of CHS. The preference for these hospitals is to, in fact, purchase a primary insurance policy for employed physicians. However, a lot of physicians prefer to maintain their own primary insurance policy through MICA or Admiral. In this case, you'll see in the record the application that was filed by Dr. Schwartz for Admiral insurance. He used Admiral insurance because he had a history of medical malpractice claims that made it difficult for him to be insured through other policies. So he wanted to maintain his Admiral policy. The hospital, in the employment agreement, gave doctors two options. You can maintain your own separate physician policy through Admiral, MICA, whatever outside separate insurance carrier you choose and we will pay the premiums. Or, if you choose not to do that, we will have you apply for and we'll bring you in to our captive insurance provider, which in this case was a SIG physician policy that is entirely inapplicable to this case because one was never issued on behalf of Dr. Schwartz. He was covered by the Admiral policy. So what was the answer to the question as to why the insurance policies were not provided? I'm sorry, Your Honor. The hospital paid the premiums. Not the provision. The insurance, the copy of the insurance. Disclose. I'm sorry, Your Honor. I misunderstood your question. The captive insurance, because these policies cover hundreds of hospitals and clinics, at least for CHS, and I think this is true for a lot of other hospital systems, they don't just go and pass their insurance policy around because it covers so many different entities. It's like a commercial general liability. It's like a CGL policy. Specifically with respect to captive insurance companies, there is a statute in Arizona that very clearly states, and that statute is 20-1098.23 subsection A, that captive insurance policies are permitted to have this additional level of confidentiality because they cover such broad provisions and so many different insureds. So, CHS has a policy. It does not provide its policy to just anybody. This is for the privacy of the doctors? No, it is a proprietary document. In my client's view, in CHS's view, it is a proprietary document that includes information that it does not want to be put out into the general public. It will provide a copy of the policy when there is a case brought for equitable contribution. And in fact, if you read the record in this case, Judge Gertler, who was the judge in Mojave County that heard the underlying litigation, the medical malpractice case, he twice denied motions to compel the production of this policy stating that there was no dispute between the carriers that had been filed. There was no claim for equitable contribution making that policy relevant or necessary to be produced. Was that the reason it wasn't provided to Admiral because there was the idea that there was no entitlement to equitable contribution? No, it was not produced to Admiral because the company has a policy that it does not produce its policy unless it has to do so pursuant to litigation. And there was no litigation that had been filed. And I do think it's important to say opposing counsel made a reference and it's also in the papers that SIG somehow laid in the reads and didn't tell anybody about the coverage. That's simply not true. The record is clear that immediately upon threat in the underlying litigation that there would be claims brought against the clinic. Attorneys for the clinic, Mary Brooksby, told the attorney for Admiral, Ms. Chait, we provide excess coverage for Dr. Schwartz pursuant to our commercial general liability policy. We will produce a copy of the certificate of insurance proving that coverage when the case is filed. And we will not produce a copy. The case being what? Admiral's declaratory judgment? No. When at the time in 2010 there was a threat that they would add the clinic as an additional defendant in the underlying litigation. And she said when that happens we'll produce a copy of the certificate of insurance. But we will not produce an entire copy of our policy because we have an internal corporate policy that we do not produce our policy just that. That's just the policy that they had. So this idea that somehow they were laying in the reeds is simply a red herring that is unsupported by the record. Is that argument made in the district court that somehow this is inequitable? Yes. And Judge Schroeder it's a good point. You'll notice that on the one ER page 33 which is Judge Campbell's order he drops a footnote in there and he says there's much ado about much ink has been spilled over this issue of hiding the policy, not producing the policy. And he just cut through all of that and said it's not relevant. What's relevant here is looking at the language of the policies and determining the effect of those other insurance clauses. On that note do you see a difference in the language of the excess insurance clauses in the two policies? Absolutely, Your Honor. What's the difference in the language in your view that would render Admiral Primary and CIG excess? Your Honor the language that you need to look at is in Admiral's other insurance provision. That is Section 8B. But what page of the record is that on? Section 8B? That is the other insurance clause and let me point you to the record. Your Honor, are you wanting a cite to the actual policy or can I just cite you to Judge Campbell's ruling that includes the language? Okay. Does Judge Campbell's ruling have both the Admiral language and the? Yes it does, Your Honor. So I saw on page 36 was the CIG language. Okay, so on page 36 of the ruling. And page 36 of the ruling is the language from the CIG policy. Then if you look at page Sorry, Your Honor. I didn't see the Admiral language. That's why I was asking you. Is this the language that says this insurance shall be excess of and not contribute with? That is, the language that you're reading on page 6 is the CIG language. That's why I was asking you the question about what the Admiral, where the Admiral language is. I thought it was I think that I would have this right in front of me. I would. Is that the paragraph that finishes with this condition does not apply to other insurance that is written? That's correct. Excess of the limit provided by this policy? Yeah, that's what I thought. That's correct, Judge Treya. And so, I'm looking at the language. I just and I can't put my finger on the exact ER site, but it is the language at section 8B where it says that it is an excess. But then the very last sentence, the very key language is this condition does not apply to other insurance that is written to apply in excess of the limits provided by this policy. That is the difference. Judge Treya, what page of the excerpts of record are you reading from? I'm afraid I'm reading from my memorandum. Oh. I think it's 1465. I think it says 1465. Okay. I just wanted to go to that. Okay. 8B. I got it. That's exactly right. Okay. That's right. It's 1465. And it's that language that differentiates the two other insurance provisions. And what Admiral would like this Court to do, as it urged Judge Campbell to do, is to simply hold that because the two policies have other insurance provisions, they should just cancel each other out without actually reading the language. That's not the law in this case. The courts look to the language to see if they can give effect to the plain language of both policies. Here, we don't end up in this circuitous loop, which is the case, as Admiral cites, to say that the other insurance clauses are mutually repugnant. That only happens in cases where the other insurance clauses can't be read together. There is no circuitous loop here. And that language that says that condition doesn't apply is really the key language. And that's what he held. And then, and I will spend just a moment talking about the totality of the circumstances. The reason that it was appropriate for Judge Campbell to move on to the totality of circumstances, although we concede that it's not necessary, this case can be resolved on the plain language, the reason it's acceptable to do that here is because of the fact that the premiums that were paid, the primary-priced premiums that were paid in this case, were paid by the very entity that Admiral is now commenting after to say, we are seeking contribution from you. Ginsburg. Well, when I asked who paid the premiums, opposing counsel said, you really can't tell who paid the premiums. That's not true, Your Honor. Admiral concedes. Admiral received the premiums, and it responded in response to interrogatories that were asked of it in this case, that it received premiums at the primary pricing from SIG or from the clinic or CHS. In our view, that's enough to say that the premiums were paid by the same general entity that now they're seeking contribution against. SIG is an affiliate of CHS, and the clinic is an affiliate of CHS, the holding company. So the bottom line here is the totality of circumstances, while not necessary to be reached, was perfectly acceptable for Judge Campbell to do that. And I will just end by addressing Judge Torea's comment or question about whether or not this Court can decide this case on selective tender if, for some reason, it does not affirm Judge Campbell's ruling on the plain language. And the answer is yes. This Court held in ATEL-FinCorp v. Quaker Coal Company that you may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt. The selective tender doctrine argument was made and to the district court, even though Judge Campbell did not reach it. In this case, the three elements of a selective tender were not made. Those are a full and fair information, an explicit demand to undertake a defense, and an offer to surrender control of the case. That did not happen. Admiral concedes at most what it did was ask for the policy and that was sufficient under this Court's ruling in Excel Specialty that selective tender was not made. All right. Thank you, counsel. Thank you. Rebuttal. Your Honor, just a couple notes. First on that selective tender argument, let's go back to Judge Teelberg's decision in the Conta case. Judge Teelberg said specifically Arizona law does not recognize the selective tender doctrine, doesn't have case law on it, but then he tried to delineate what he believed that the courts would do in case there were to be a selective tender doctrine applied. And he said again, if you read his case, it goes to whether there was notice, as Judge Rosenblatt held there was in this case, and whether the intent of the party that was attending the essentially tender knew what was coming and knew why they wanted it. Here again, that's in the correspondence. They acknowledge, CIG's own counsel acknowledged, they're trying to drag us into the settlement. They're trying to get contribution. With regards to the captive insurance issue, captive carriers don't compete. There's no basis for propriety. They have nobody that, they don't compete with Admiral. They only have one customer, the clinic. They don't sell insurance to everybody else. They only, they are essentially a Cayman Island entity created by the clinics themselves to self-insure. Arizona law in all cases mandates that insurance policies be disclosed in state law cases. So this idea that these types of things are proprietary just isn't supported by practice in Arizona. With regards to 2098, that is an insurance regulation that says the Department of Insurance may not disclose captive carriers' proprietary information. That same regulation also says that that should be disclosed in civil litigation. Finally, with regards to, by the way, the internal policy that they're talking about, Ms. Yates testified, the reason that CIG does not want this policy out there is they don't want it to get into the hands of plaintiff's lawyers. That's not the basis for protecting proprietary information that this court should uphold. Finally, Judge, relative to public policy, if the court were to allow Judge Campbell's decision to stand, we believe that that's going to take us back to what that South Carolina court called the dark ages or those dimly lit era where we're going to get back into the era of draftsmanship. Who can out-specific one another, who can pull the got you on my insurance cause for other insurance is better than yours. And away from the trend that the dark court setting, the Supreme Court of California, the trend towards when they look like they're representing the same interests, they're covering the same interests, and they're trying to both get out of coverage. Let's hit them both for prorotic coverage. They're mutually repugnant. Finally, the conduct here by CIG, if that's upheld, then courts are encouraging insurers to essentially, again, lay in their reeds, obfuscate, hold, don't share the policy. To this date, we have not seen the physician's policy. We don't know what it says. All we've been told is the vowels in the briefing, don't worry, you're not covered. This is litigation. We should have been able to see it. We should have been able to see the premium. What was the language the judge relied upon if it was not the policy? That's the problem. He made inferences with regards to what was in the policy and the premium without actually seeing it. And we're saying, even before the motion was filed, Judge, we had a discovery fight in this issue. We went to the court and we said, those issues are relevant. We want that information. What was the genesis of the language from the CIG policy? Where did that come from, if the policy wasn't produced or disclosed? Where did he get the language of what the excess policy provided, the excess policy language? Where did that come from, if it wasn't from the policy? The policy itself is a primary policy. CIG admitted it was a primary policy. It has an other insurance clause where it says, we are primary. And it said, this is a primary policy unless there is other coverage out there that would then make this an excess policy. The problem is, the admiral policy says the same thing. All right. Thank you, counsel. Thank you to both counsel. Thank you very much. The case just argued is submitted for decision by the court. That completes our calendar for the day and for the week. We are adjourned.
judges: Torruella, Schroeder, Rawlinson